## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
CASE NO.

RICHEMONT INTERNATIONAL SA,
AZZEDINE ALAÏA SAS, CARTIER
INTERNATIONAL A.G., CHLOE S.A.S.,
OFFICINE PANERAI A.G., PETER MILLAR
LLC, and VAN CLEEF & ARPELS SA,

        Plaintiffs,

vs.

THE INDIVIDUALS, BUSINESS ENTITIES,
AND UNINCORPORATED ASSOCIATIONS
IDENTIFIED ON SCHEDULE "A,"

        Defendants.

_____/

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiffs, Richemont International SA, Azzedine Alaïa SAS, Cartier International A.G., Chloe S.A.S., Officine Panerai A.G., Peter Millar LLC, and Van Cleef & Arpels SA (collectively "Plaintiffs"),[1] hereby sue Defendants, the Individuals, Business Entities, and Unincorporated Associations Identified on Schedule "A" hereto (collectively "Defendants"). Defendants are promoting, offering for sale, selling, and/or distributing goods bearing and/or using counterfeits and confusingly similar imitations of Plaintiffs' respective trademarks within this district through various Internet based e-commerce stores operating under the seller names set forth on Schedule "A" (the "E-commerce Store Names"). In support of their claims, Plaintiffs allege as follows:

---

[1] Plaintiffs are all subsidiaries of Compagnie Financière Richemont SA, which is one of the world's leading luxury goods groups.

## JURISDICTION AND VENUE

1.      This is an action for damages and injunctive relief for federal trademark counterfeiting and infringement, false designation of origin, cybersquatting, common law unfair competition, and common law trademark infringement pursuant to 15 U.S.C. §§ 1114, 1116, 1125(a), and 1125(d), The All Writs Act, 28 U.S.C. § 1651(a), and Florida's common law. Accordingly, this Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' state law claims because those claims are so related to the federal claims that they form part of the same case or controversy.

2.      Defendants are subject to personal jurisdiction in this district because they direct business activities toward and conduct business with consumers throughout the United States, including within the State of Florida and this district through, at least, the Internet based e-commerce stores[2] accessible and doing business in Florida and operating under their E-commerce Store Names. Alternatively, based on their overall contacts with the United States, Defendants are subject to personal jurisdiction in this district pursuant to Federal Rule of Civil Procedure 4(k)(2) because (i) Defendants are not subject to jurisdiction in any state's court of general jurisdiction; and (ii) exercising jurisdiction is consistent with the United States Constitution and laws.

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 since Defendants are, upon information and belief, non-residents in the United States and engaged in infringing activities

---

[2] Certain Defendants use their respective E-commerce Store Name in tandem with electronic communication via private messaging applications and/or services to complete their offer and sale of counterfeit branded products. Specifically, consumers are able to browse listings of branded products online via the respective Defendant's E-commerce Store Name, ultimately directing customers to send inquiries, exchange data, and complete purchases via electronic communication with the Defendant.

and causing harm within this district by advertising, offering to sell, selling, and/or shipping infringing products into this district.

## THE PLAINTIFFS

4.      Plaintiff Richemont International SA ("Richemont") is a public limited company organized and existing under the laws of Switzerland, having its principal place of business at 10 Route des Biches, Villars-sur-Glane, Fribourg, Switzerland. Richemont's Maisons include, *inter alia*, IWC Schaffhausen ("IWC") and Vacheron Constantin ("Vacheron Constantin").

5.      Plaintiff Azzedine Alaïa SAS ("Alaïa") is a company organized and existing under the laws of France, having its principal place of business at 7 Rue De Moussy, 75004 Paris, France.

6.      Plaintiff Cartier International A.G. ("Cartier") is a public limited company organized and existing under the laws of Switzerland, having its principal place of business at Hinterbergstrasse 22, Postfach 61, 6312 Steinhausen, Switzerland.

7.      Plaintiff Chloe S.A.S. ("Chloe") is a company organized and existing under the laws of France, having its principal place of business at 5/7 Avenue Percier, 75008 Paris, France.

8.      Plaintiff Officine Panerai A.G. ("Panerai") is a public company organized and existing under the laws of Switzerland, having its principal place of business at Hinterbergstrasse 22, Postfach 61, 6312 Steinhausen, Switzerland.

9.      Plaintiff Peter Millar LLC ("Peter Millar") is a limited liability company organized and existing under the laws of the State of Delaware, having its principal place of business at 1002 Twin Creeks Ct, Durham, North Carolina, 27703.

10.     Plaintiff Van Cleef & Arpels SA ("Van Cleef") is a company organized and existing under the laws of Switzerland, having its principal place of business at 8 Route des Biches, CH-1752 Villars-sur-Glane, Switzerland.

11.     Goods bearing Plaintiffs' registered trademarks set forth below are offered for sale and sold through various channels of trade within the State of Florida, including this district, and throughout the United States. Defendants, through the advertising, sale, and offers to sell of counterfeit and infringing versions of Plaintiffs' branded products are directly, and unfairly, competing with each Plaintiffs' economic interests in the United States, including within the State of Florida, and causing each Plaintiff irreparable harm within this jurisdiction.

12.     Like many other famous trademark owners, Plaintiffs suffer ongoing daily and sustained violations of their respective trademark rights at the hands of counterfeiters and infringers, such as Defendants herein, who wrongfully reproduce and counterfeit Plaintiffs' trademarks for the twin purposes of (i) duping and confusing the consuming public and (ii) earning substantial profits across their e-commerce stores. The natural and intended byproduct of Defendants' combined actions is the erosion and destruction of the goodwill associated with Plaintiffs' respective names and associated trademarks, as well as the destruction of the legitimate market sector in which they operate.

13.     To combat the indivisible harm caused by the concurrent actions of Defendants and others engaging in similar conduct, each year Plaintiffs expend significant monetary resources in connection with trademark enforcement efforts, including legal fees, investigative fees, and support mechanisms for law enforcement. The exponential growth of counterfeiting over the Internet, including through online marketplace and social media platforms, has created an environment that requires companies, such as Plaintiffs, to expend significant resources across a wide spectrum of efforts in order to protect both consumers and themselves from the confusion and the erosion of the goodwill embodied in Plaintiffs' respective brands.

## THE DEFENDANTS

14.     Defendants are individuals, business entities of unknown makeup, or unincorporated associations each of whom, upon information and belief, either reside and/or operate in foreign jurisdictions, redistribute products from the same or similar sources in those locations, and/or ship their goods from the same or similar sources in those locations to consumers as well as shipping and fulfillment centers, warehouses, and/or storage facilities within the United States to redistribute their products from those locations. Defendants have the capacity to be sued pursuant to Federal Rule of Civil Procedure 17(b). Defendants target their business activities toward consumers throughout the United States, including within this district, through the simultaneous operation of, at least, their commercial Internet based e-commerce stores under the E-commerce Store Names.

15.     Some Defendants operate under the E-commerce Store Names in tandem with electronic communication via private messaging applications and/or services, thereby creating an interconnected ecosystem which functions as an online marketplace operation.

16.     Defendants use aliases in conjunction with the operation of their businesses, including but not limited to those identified by Defendant Number on Schedule "A."

17.     Defendants are the past and/or present controlling forces behind the sale of products bearing and/or using counterfeits and infringements of Plaintiffs' trademarks as described herein.

18.     Defendants directly engage in unfair competition with Plaintiffs by advertising, offering for sale, and/or selling goods each bearing and/or using counterfeits and infringements of one or more of Plaintiffs' respective trademarks to consumers within the United States and this district through Internet based e-commerce stores using, at least, the E-commerce Store Names, as well as additional e-commerce store or seller identification aliases not yet known to Plaintiffs.

Defendants have purposefully directed some portion of their unlawful activities toward consumers in the State of Florida through the advertisement, offer to sell, sale, and/or shipment of counterfeit and infringing branded versions of Plaintiffs' branded goods into the State.

19.     Defendants have registered, established or purchased, and maintained their E-commerce Store Names. Defendants may have engaged in fraudulent conduct with respect to the registration of the E-commerce Store Names by providing false and/or misleading information during the registration or maintenance process related to their respective E-commerce Store Names. Many Defendants have anonymously registered and/or maintained their E-commerce Store Names for the sole purpose of engaging in unlawful infringing and counterfeiting activities.

20.     Defendants will likely continue to register or acquire new e-commerce store names, or other aliases, as well as related payment accounts, for the purpose of offering for sale and/or selling goods bearing and/or using counterfeit and confusingly similar imitations of one or more of Plaintiffs' trademarks unless preliminarily and permanently enjoined.

21.     Defendants' E-commerce Store Names, associated payment accounts, and any other alias e-commerce store or seller identification names used in connection with the sale of counterfeit and infringing goods bearing and/or using one or more of Plaintiffs' respective trademarks are essential components of Defendants' online activities and are one of the means by which Defendants further their counterfeiting and infringement schemes and cause harm to Plaintiffs.  Moreover, Defendants are using one or more of Plaintiffs' respective famous brand names and/or associated trademarks to drive Internet consumer traffic to at least one of their e-commerce stores operating under the E-commerce Store Names, thereby increasing the value of the E-commerce Store Names and decreasing the size and value of Plaintiffs' legitimate marketplace and intellectual property rights at Plaintiffs' expense.

## COMMON FACTUAL ALLEGATIONS

### Richemont's Business and Trademark Rights

22.     Richemont is the owner of all rights, title, and interest in the IWC and Vacheron

Constantin trademarks, identified in Paragraphs 23 and 29 below.

23.     The IWC trademarks are valid and registered on the Principal Register of the United

States Patent and Trademark Office (the "IWC Marks"):

| Trademark | Registration Number | Registration Date | Class / Goods |
|---|---|---|---|
| IWC | 1,205,403 | August 17, 1982 | IC 014 - Watches |
| PORTOFINO | 1,846,680 | July 26, 1994 | IC 014 - Watches and parts therefore |
| IWC SCHAFFHAUSEN | 4,270,382 | January 8, 2013 | IC 014 - Watches, chronometers, clocks; straps for wristwatches, boxes of precious metal for watches and all the aforementioned goods from Switzerland |
| IWC | 4,322,600 | April 23, 2013 | IC 014 - Watches, chronometers, clocks, watch bands, boxes of precious metal for watches |

The IWC Marks are used in connection with the manufacture and distribution of high-quality

goods in the categories identified above. True and correct copies of the Certificates of Registration

for the IWC Marks are attached hereto as Composite Exhibit "1."

24.     The IWC Marks have been used in interstate commerce to identify and distinguish

IWC's high-quality goods for an extended period of time. The IWC Marks are symbols of IWC's

quality, reputation and goodwill and have never been abandoned.

25.     Further, IWC expends substantial resources developing, advertising and otherwise

promoting the IWC Marks. The IWC Marks qualify as famous marks as that term is used in 15

U.S.C. §1125(c)(1).

26.    IWC extensively uses, advertises and promotes the IWC Marks in the United States in association with the sale of high-quality goods. As a result, the IWC Marks are among the most widely recognized trademarks in the United States, and the trademarks have achieved secondary meaning as an identifier of high-quality goods.

27.    IWC has carefully monitored and policed the use of the IWC Marks and has never assigned or licensed the IWC Marks to any Defendant in this matter.

28.    Genuine goods bearing and/or using the IWC Marks are widely legitimately advertised and promoted by IWC, its authorized distributors, and unrelated third parties via the Internet. Visibility on the Internet, particularly via Internet search engines and social media platforms, is important to IWC's overall marketing and consumer education efforts. Thus, IWC expends significant monetary and other resources on Internet marketing and consumer education, including search engine optimization ("SEO"), search engine marketing ("SEM"), and social media strategies. Those strategies allow IWC and its authorized retailers to educate consumers fairly and legitimately about the value associated with the IWC brand and the goods sold thereunder, and the problems associated with the counterfeiting of IWC's trademarks.

29.    The Vacheron Constantin trademarks are valid and registered on the Principal Register of the United States Patent and Trademark Office (the "VACHERON CONSTANTIN Marks"):

| Registered Trademark | Registration Number | Registration Date | Classes/Goods |
|---|---|---|---|
| ✳ **VACHERON CONSTANTIN** | 3,114,414 | July 11, 2006 | IC 014 - Cuff links; watches, chronometers, clocks, watchstraps, cases of precious metal for watches and jewellery |
| VACHERON CONSTANTIN | 5,630,166 | December 18, 2018 | IC 014 - Jewelry; Cuff links; Tie clips; Jewelry |

| | | | in the nature of rings, bracelets, earrings, necklaces and brooches; Timepieces in the nature of clocks; Dials for clock and watch making; Key rings of precious metal; Timepieces and chronometric instruments; Watches; Chronometers; Cases adapted for holding watches; Movements for timepieces in the nature of clocks and watches; Alarm clocks; Watch bands; Boxes of precious metal |
|---|---|---|---|

The VACHERON CONSTANTIN Marks are used in connection with the manufacture and distribution of high-quality goods in the categories identified above. True and correct copies of the Certificates of Registration for the VACHERON CONSTANTIN Marks are attached hereto as Composite Exhibit "2."

30.     The VACHERON CONSTANTIN Marks have been used in interstate commerce to identify and distinguish Vacheron Constantin's high-quality goods for an extended period of time. The VACHERON CONSTANTIN Marks are symbols of Vacheron Constantin's quality, reputation and goodwill and have never been abandoned.

31.     Further, Vacheron Constantin expends substantial resources developing, advertising and otherwise promoting the VACHERON CONSTANTIN Marks. The VACHERON CONSTANTIN Marks qualify as famous marks as that term is used in 15 U.S.C. §1125(c)(1).

32.     Vacheron Constantin extensively uses, advertises and promotes the VACHERON CONSTANTIN Marks in the United States in association with the sale of high-quality goods. As a result, the VACHERON CONSTANTIN Marks are among the most widely recognized

trademarks in the United States, and the trademarks have achieved secondary meaning as an identifier of high-quality goods.

33.     Vacheron Constantin has carefully monitored and policed the use of the VACHERON CONSTANTIN Marks and has never assigned or licensed the VACHERON CONSTANTIN Marks to any Defendant in this matter.

34.     Genuine goods bearing and/or using the VACHERON CONSTANTIN Marks are widely legitimately advertised and promoted by Vacheron Constantin, its authorized distributors, and unrelated third parties via the Internet.  Visibility on the Internet, particularly via Internet search engines and social media platforms, is important to Vacheron Constantin's overall marketing and consumer education efforts. Thus, Vacheron Constantin expends significant monetary and other resources on Internet marketing and consumer education, including SEO, SEM, and social media strategies. Those strategies allow Vacheron Constantin and its authorized retailers to educate consumers fairly and legitimately about the value associated with the Vacheron Constantin brand and the goods sold thereunder, and the problems associated with the counterfeiting of Vacheron Constantin's trademarks.

**Alaïa's Business and Trademark Rights**

35.     Alaïa is the owner of all rights in and to the following trademarks, which are valid and registered on the Principal Register of the United States Patent and Trademark Office (the "ALAÏA Marks"):

| Registered Trademark | Registration Number | Registration Date | Classes/Goods |
|---|---|---|---|
| ALAÏA | 2,011,468 | October 29, 1996 | IC 018 - Leather goods, namely, bags, handbags, wallets, purses, and umbrellas<br><br>IC 025 - Clothes for women, namely, trousers, suits, dresses, jackets, |

| | | | blouses, sweaters, shirts, coats, swimsuits, underwear, lingerie, shoes, headwear |
|---|---|---|---|
| ALAÏA | 3,505,437 | September 23, 2008 | IC 018 - Handbags; leather satchels; wallets; purses not of precious metal; leather shopping bags; small leather bags in the nature of envelopes and pouches for packaging |

The ALAÏA Marks are used in connection with the manufacture and distribution of high-quality goods in the categories identified above. True and correct copies of the Certificates of Registration for the ALAÏA Marks are attached hereto as Composite Exhibit "3."

36.     The ALAÏA Marks have been used in interstate commerce to identify and distinguish Alaïa's high-quality goods for an extended period of time. The ALAÏA Marks are symbols of Alaïa's quality, reputation and goodwill and have never been abandoned.

37.     Further, Alaïa expends substantial resources developing, advertising and otherwise promoting the ALAÏA Marks. The ALAÏA Marks qualify as famous marks as that term is used in 15 U.S.C. §1125(c)(1).

38.     Alaïa extensively uses, advertises and promotes the ALAÏA Marks in the United States in association with the sale of high-quality goods. As a result, the ALAÏA Marks are among the most widely recognized trademarks in the United States, and the trademarks have achieved secondary meaning as an identifier of high-quality goods.

39.     Alaïa has carefully monitored and policed the use of the ALAÏA Marks and has never assigned or licensed the ALAÏA Marks to any Defendant in this matter.

40.     Genuine goods bearing and/or using the ALAÏA Marks are widely legitimately advertised and promoted by Alaïa, its authorized distributors, and unrelated third parties via the Internet.  Visibility on the Internet, particularly via Internet search engines and social media platforms, is important to Alaïa's overall marketing and consumer education efforts. Thus, Alaïa

expends significant monetary and other resources on Internet marketing and consumer education, including SEO, SEM, and social media strategies. Those strategies allow Alaïa and its authorized retailers to educate consumers fairly and legitimately about the value associated with the Alaïa brand and the goods sold thereunder, and the problems associated with the counterfeiting of Alaïa's trademarks.

**Cartier's Business and Trademark Rights**

41.    Cartier is the owner of all rights in and to the following trademarks, which are valid and registered on the Principal Register of the United States Patent and Trademark Office (the "CARTIER Marks"):

| Registered Trademark | Registration Number | Registration Date | Classes/Goods |
|---|---|---|---|
| CARTIER | 0,411,239 | January 9, 1945 | IC 014 - Precious-Metal Ware-namely, the following articles made, in whole or in part, of Precious Metals or Plated With the Same; Jewel Boxes, Fobs, Bracelets, Watch Bracelets And Buckles Therefore, not including Watches, Cuff Links, Brooches, Earrings, Eyeglass Cases, Cigarette Lighters, Ash Trays, Envelope Openers, Wallets, Money Clips, Perfume Bottles, Desk Sets, Handbags, Key Chains, Finger Rings. |
| *Cartier* | 0,411,240 | January 9, 1945 | IC 014 - Articles of Jewelry for Personal Wear and for Precious-Metal Ware-Namely, the Following Articles Made, in Whole or in Part, of Precious Metals or Plated with the Same-- viz, Jewel Boxes, Fobs, Bracelets, Watch Bracelets and Buckles Therefor, Not Including Watches, Cuff Links, Brooches, Earrings, Eyeglass Cases, Cigarette Lighters, Ash Trays, Envelope Openers, Wallets, Money Clips, Perfume Bottles, Desk Sets, Handbags, Key Chains, Finger Rings |

| Mark | Reg. No. | Date | Goods |
|---|---|---|---|
| *Cartier* | 0,411,975 | February 13, 1945 | IC 014 - Watches and Clocks and Wrist Watches with Wrist Straps and Bracelets Attached for Securing the Same on the Wrist of the Wearer, and Traveling Clocks and Watches with Covers of Leather, Fabric and the Like for Protecting Them While Traveling |
| CARTIER | 0,759,201 | October 29, 1963 | IC 014 - Watches and Clocks |
| TANK | 1,006,321 | March 11, 1975 | IC 014 - Watches |
| (logo) | 1,114,482 | March 6, 1979 | IC 014 – Articles of Jewelry, Watches |
| SANTOS | 1,344,284 | June 25, 1985 | IC 014 - Watches |
| BALLON BLEU | 3,476,888 | July 29, 2008 | IC 014 - Watches, Chronometers, Clocks |
| *Cartier* | 4,178,047 | July 24, 2012 | IC 014 - Jewelry and watches |

The CARTIER Marks are used in connection with the manufacture and distribution of high-quality goods in the categories identified above. True and correct copies of the Certificates of Registration for the CARTIER Marks are attached hereto as Composite Exhibit "4."

42.     The CARTIER Marks have been used in interstate commerce to identify and distinguish Cartier's high-quality goods for an extended period of time. The CARTIER Marks are symbols of Cartier's quality, reputation and goodwill and have never been abandoned.

43.     Further, Cartier expends substantial resources developing, advertising and otherwise promoting the CARTIER Marks. The CARTIER Marks qualify as famous marks as that term is used in 15 U.S.C. §1125(c)(1).

44.     Cartier extensively uses, advertises and promotes the CARTIER Marks in the United States in association with the sale of high-quality goods. As a result, the CARTIER Marks are among the most widely recognized trademarks in the United States, and the trademarks have achieved secondary meaning as an identifier of high-quality goods.

45.     Cartier has carefully monitored and policed the use of the CARTIER Marks and has never assigned or licensed the CARTIER Marks to any Defendant in this matter.

46.     Genuine goods bearing and/or using the CARTIER Marks are widely legitimately advertised and promoted by Cartier, its authorized distributors, and unrelated third parties via the Internet.  Visibility on the Internet, particularly via Internet search engines and social media platforms, is important to Cartier's overall marketing and consumer education efforts. Thus, Cartier expends significant monetary and other resources on Internet marketing and consumer education, including SEO, SEM, and social media strategies. Those strategies allow Cartier and its authorized retailers to educate consumers fairly and legitimately about the value associated with the Cartier brand and the goods sold thereunder, and the problems associated with the counterfeiting of Cartier's trademarks.

**Chloe's Business and Trademark Rights**

47.     Chloe is the owner of all rights in and to the following trademarks, which are valid and registered on the Principal Register of the United States Patent and Trademark Office (the "CHLOE Marks"):

| Registered Trademark | Registration Number | Registration Date | Classes/Goods |
|---|---|---|---|
| CHLOE | 1,491,810 | June 14, 1988 | IC 018 - Handbags, Purses |
| Chloé | 3,291,996 | September 11, 2007 | IC 018 - Goods made of leather and imitations of leather, namely, handbags, purses, credit card cases and holders, key cases, coin purses |

The CHLOE Marks are used in connection with the manufacture and distribution of high-quality goods in the categories identified above. True and correct copies of the Certificates of Registration for the CHLOE Marks are attached hereto as Composite Exhibit "5."

48.     The CHLOE Marks have been used in interstate commerce to identify and distinguish Chloe's high-quality goods for an extended period of time. The CHLOE Marks are symbols of Chloe's quality, reputation and goodwill and have never been abandoned.

49.     Further, Chloe expends substantial resources developing, advertising and otherwise promoting the CHLOE Marks. The CHLOE Marks qualify as famous marks as that term is used in 15 U.S.C. §1125(c)(1).

50.     Chloe extensively uses, advertises and promotes the CHLOE Marks in the United States in association with the sale of high-quality goods. As a result, the CHLOE Marks are among the most widely recognized trademarks in the United States, and the trademarks have achieved secondary meaning as an identifier of high-quality goods.

51.     Chloe has carefully monitored and policed the use of the CHLOE Marks and has never assigned or licensed the CHLOE Marks to any Defendant in this matter.

52.     Genuine goods bearing and/or using the CHLOE Marks are widely legitimately advertised and promoted by Chloe, its authorized distributors, and unrelated third parties via the Internet. Visibility on the Internet, particularly via Internet search engines and social media

platforms, is important to Chloe's overall marketing and consumer education efforts. Thus, Chloe expends significant monetary and other resources on Internet marketing and consumer education, including SEO, SEM, and social media strategies. Those strategies allow Chloe and its authorized retailers to educate consumers fairly and legitimately about the value associated with the Chloe brand and the goods sold thereunder, and the problems associated with the counterfeiting of Chloe's trademarks.

**Panerai's Business and Trademark Rights**

53.    Panerai is the owner of all rights in and to the following trademarks, which are valid and registered on the Principal Register of the United States Patent and Trademark Office (the "PANERAI Marks"):

| Registered Trademark | Registration Number | Registration Date | Classes/Goods |
|---|---|---|---|
| PANERAI | 2,340,290 | April 11, 2000 | IC 014 - Chronometers, watches |
| LUMINOR | 2,516,018 | December 11, 2001 | IC 014 - Chronometers, watches and clocks |
|  | 3,004,529 | October 4, 2005 | IC 014 - Boxes and cases for watches; chronometers, watches |
| OFFICINE PANERAI | 4,009,035 | August 9, 2011 | IC 014 - Watches and clocks; watch accessories, namely, watch straps, and buckles for watch bands and watch straps. |

The PANERAI Marks are used in connection with the manufacture and distribution of high-quality goods in the categories identified above. True and correct copies of the Certificates of Registration for the PANERAI Marks are attached hereto as Composite Exhibit "6."

54.     The PANERAI Marks have been used in interstate commerce to identify and distinguish Panerai's high-quality goods for an extended period of time. The PANERAI Marks are symbols of Panerai's quality, reputation and goodwill and have never been abandoned.

55.     Further, Panerai expends substantial resources developing, advertising and otherwise promoting the PANERAI Marks. The PANERAI Marks qualify as famous marks as that term is used in 15 U.S.C. §1125(c)(1).

56.     Panerai extensively uses, advertises and promotes the PANERAI Marks in the United States in association with the sale of high-quality goods. As a result, the PANERAI Marks are among the most widely recognized trademarks in the United States, and the trademarks have achieved secondary meaning as an identifier of high-quality goods.

57.     Panerai has carefully monitored and policed the use of the PANERAI Marks and has never assigned or licensed the PANERAI Marks to any Defendant in this matter.

58.     Genuine goods bearing and/or using the PANERAI Marks are widely legitimately advertised and promoted by Panerai, its authorized distributors, and unrelated third parties via the Internet.  Visibility on the Internet, particularly via Internet search engines and social media platforms, is important to Panerai's overall marketing and consumer education efforts. Thus, Panerai expends significant monetary and other resources on Internet marketing and consumer education, including SEO, SEM, and social media strategies. Those strategies allow Panerai and its authorized retailers to educate consumers fairly and legitimately about the value associated with

the Panerai brand and the goods sold thereunder, and the problems associated with the counterfeiting of Panerai's trademarks.

### Peter Millar's Business and Trademark Rights

59.     Peter Millar is the owner of all rights in and to the following trademarks, which are valid and registered on the Principal Register of the United States Patent and Trademark Office (the "PETER MILLAR Marks"):

| Registered Trademark | Registration Number | Registration Date | Classes/Goods |
|---|---|---|---|
| PETER MILLAR | 2,881,454 | September 7, 2004 | IC 025 – Men's and Women's Clothing, Namely, Sweaters, Cardigans, Shirts, Vests, Pullovers, Polo Shirts, Turtlenecks, Jackets, Scarves, T-Shirts, Dress Shirts, Knit Shirts, Pants, Boxer Shorts |
|  | 5,728,792 | April 16, 2019 | IC 018 - Wallets, Coin Purses, Handbags, Tote Bags, Gym Bags, Sports Bags, Suitcases, Travelling Bags, Credit Card And Business Card Cases, Key Cases, Backpacks, Clutch Bags, Beach Bags, Reusable Shopping Bags, Briefcases, Travelling Trunks, Trunks, Vanity Cases Sold Empty<br><br>IC 025 - Vests; Pullovers; Polo Shirts; Turtlenecks; Jackets; Water Proof Jackets; Wind Resistant Jackets; Pants; Outerwear Bottoms, Namely, Ski Pants, Waterproof Pants, Wind Pants, Baselayer Bottoms; Belts; Blouses; Shirts; Tee-Shirts; Knitwear, Namely, Knit Shirts, Skirts, Tops, Bottoms, Jackets, Gloves, |

| | | | |
|---|---|---|---|
| | | | Headwear, And Underwear; Cardigans; Dresses; Skirts; Shorts; Trousers; Suits; Hats; Caps Being Headwear; Scarves; Lingerie; Sleepwear; Leisure Wear, Namely, Leisure Shoes And Leisure Suits; Sweatshirts; Coats; Boots; Shoes; Sports Shoes; Trainers In The Nature Of Casual Footwear |
| PETER MILLAR | 6,183,989 | Oct. 27, 2020 | IC 025 - Vests, Pullovers, Polo Shirts, Jackets, Water Proof Jackets, Wind-Proof Jackets, Windbreakers, Sweatshirts, Pants, Outerwear Bottoms, Shirts, Tee-Shirts, Knitwear Being Shirts, Dresses, And Sweaters, Cardigans, Skirts, Shorts, Trousers, Suits, Ties As Clothing, Belts, Hats, Golf Caps, Baseball Caps, Scarves, Leisure Wear Being Tops And Bottoms, Leisure Jackets, And Leisure Shoes, Swimwear, Socks, Boots, Shoes, Sports Shoes, Trainers Being Sneakers |

The PETER MILLAR Marks are used in connection with the manufacture and distribution of high-quality goods in the categories identified above. True and correct copies of the Certificates of Registration for the PETER MILLAR Marks are attached hereto as Composite Exhibit "7."

60.     The PETER MILLAR Marks have been used in interstate commerce to identify and distinguish Peter Millar's high-quality goods for an extended period of time. The PETER MILLAR Marks are symbols of Peter Millar's quality, reputation and goodwill and have never been abandoned.

61.     Further, Peter Millar expends substantial resources developing, advertising and otherwise promoting the PETER MILLAR Marks. The PETER MILLAR Marks qualify as famous marks as that term is used in 15 U.S.C. §1125(c)(1).

62.     Peter Millar extensively uses, advertises and promotes the PETER MILLAR Marks in the United States in association with the sale of high-quality goods. As a result, the PETER MILLAR Marks are among the most widely recognized trademarks in the United States, and the trademarks have achieved secondary meaning as an identifier of high-quality goods.

63.     Peter Millar has carefully monitored and policed the use of the PETER MILLAR Marks and has never assigned or licensed the PETER MILLAR Marks to any Defendant in this matter.

64.     Genuine goods bearing and/or using the PETER MILLAR Marks are widely legitimately advertised and promoted by Peter Millar, its authorized distributors, and unrelated third parties via the Internet. Visibility on the Internet, particularly via Internet search engines and social media platforms, is important to Peter Millar's overall marketing and consumer education efforts. Thus, Peter Millar expends significant monetary and other resources on Internet marketing and consumer education, including SEO, SEM, and social media strategies. Those strategies allow Peter Millar and its authorized retailers to educate consumers fairly and legitimately about the value associated with the Peter Millar brand and the goods sold thereunder, and the problems associated with the counterfeiting of Peter Millar's trademarks.

**Van Cleef's Business and Trademark Rights**

65.     Van Cleef is the owner of all rights in and to the following trademarks, which are valid and registered on the Principal Register of the United States Patent and Trademark Office (the "VAN CLEEF Marks"):

| Registered Trademark | Registration Number | Registration Date | Classes/Goods |
|---|---|---|---|
| Van Cleef & Arpels | 1,415,794 | November 4, 1986 | IC 014 - Jewelry and Watches |
| VCA | 1,584,572 | February 27, 1990 | IC 014 – Jewelry |
|  | 2,692,672 | March 4, 2003 | IC 014 – Jewelry; Watches |
| ALHAMBRA | 2,751,878 | August 19, 2003 | IC 014 - Precious Metal And Their Alloys And Products Made Thereof Or Coated Therewith Not Included In Other Classes, Namely, Jewelry, Horological And Chronometric Instruments, Namely, Watches And Watch Bracelets And  Necklaces, Jewelry Chains Of Precious Metal, Earrings, Jewelry Rings, Pendants, Ankle Bracelets, Cuff Links, Studs Made Of Precious Metal |
| VAN CLEEF & ARPELS | 2,936,247 | March 29, 2005 | IC 014 - Items Made Of Precious Metal, Namely, Rings, Bracelets, Earrings, Necklaces, Pendants, Charms, Brooches, Clips, Hairclips, Jewelry Boxes, Jewelry Cases, Watch Bracelets And Buckles; Jewelry, Watches And Clocks |
| ALHAMBRA | 3,489,019 | August 19, 2008 | IC 014 - Jewelry; Clock And Watch Making, Namely, Watches, Watch Bracelets |

The VAN CLEEF Marks are used in connection with the manufacture and distribution of high-quality goods in the categories identified above. True and correct copies of the Certificates of Registration for the VAN CLEEF Marks are attached hereto as Composite Exhibit "8."

66.     The VAN CLEEF Marks have been used in interstate commerce to identify and distinguish Van Cleef's high-quality goods for an extended period of time. The VAN CLEEF Marks are symbols of Van Cleef's quality, reputation and goodwill and have never been abandoned.

67.     Further, Van Cleef expends substantial resources developing, advertising and otherwise promoting the VAN CLEEF Marks. The VAN CLEEF Marks qualify as famous marks as that term is used in 15 U.S.C. §1125(c)(1).

68.     Van Cleef extensively uses, advertises and promotes the VAN CLEEF Marks in the United States in association with the sale of high-quality goods. As a result, the VAN CLEEF Marks are among the most widely recognized trademarks in the United States, and the trademarks have achieved secondary meaning as an identifier of high-quality goods.

69.     Van Cleef has carefully monitored and policed the use of the VAN CLEEF Marks and has never assigned or licensed the VAN CLEEF Marks to any Defendant in this matter.

70.     Genuine goods bearing and/or using the VAN CLEEF Marks are widely legitimately advertised and promoted by Van Cleef, its authorized distributors, and unrelated third parties via the Internet.  Visibility on the Internet, particularly via Internet search engines and social media platforms, is important to Van Cleef's overall marketing and consumer education efforts. Thus, Van Cleef expends significant monetary and other resources on Internet marketing and consumer education, including SEO, SEM, and social media strategies. Those strategies allow Van Cleef and its authorized retailers to educate consumers fairly and legitimately about the value associated with the Van Cleef brand and the goods sold thereunder, and the problems associated with the counterfeiting of Van Cleef's trademarks.

**Defendants' Infringing Activities**

71.     Defendants are each promoting, advertising, distributing, offering for sale, and/or selling goods in interstate commerce bearing and/or using counterfeit and confusingly similar imitations of one or more of the IWC Marks, VACHERON CONSTANTIN Marks, ALAÏA Marks, CARTIER Marks, CHLOE Marks, PANERAI Marks, PETER MILLAR Marks, and/or VAN CLEEF Marks (the "Counterfeit Goods") through at least the Internet based e-commerce stores operating under the E-commerce Store Names. Specifically, Defendants are using the IWC Marks, VACHERON CONSTANTIN Marks, ALAÏA Marks, CARTIER Marks, CHLOE Marks, PANERAI Marks, PETER MILLAR Marks, and/or VAN CLEEF Marks (collectively, "Plaintiffs' Marks") to initially attract online consumers and drive them to Defendants' e-commerce stores operating under the E-commerce Store Names. Defendants are each using virtually identical copies of one or more of Plaintiffs' Marks for different quality goods. Plaintiffs have used their respective trademarks extensively and continuously before Defendants began offering counterfeit and confusingly similar imitations of Plaintiffs' products.

72.     Defendants' Counterfeit Goods are of a quality substantially different than that of Plaintiffs' respective, genuine goods. Defendants are actively using, promoting and otherwise advertising, distributing, offering for sale and/or selling substantial quantities of their Counterfeit Goods with the knowledge and intent that such goods will be mistaken for the genuine high-quality goods offered for sale by Plaintiffs despite Defendants' knowledge that they are without authority to use Plaintiffs' Marks.  The net effect of Defendants' actions is likely to cause confusion of consumers, at the time of initial interest, sale, and in the post-sale setting, who will believe all of Defendants' goods offered for sale in or through Defendants' e-commerce stores are genuine goods originating from, associated with, and/or approved by Plaintiffs.

23

73.     Defendants advertise their e-commerce store websites, including their Counterfeit Goods offered for sale, to the consuming public via e-commerce stores using, at least, the E-commerce Store Names. In so doing, Defendants improperly and unlawfully use one or more of Plaintiffs' Marks without Plaintiffs' permission.

74.     Defendants are concurrently employing and benefitting from substantially similar advertising and marketing strategies based, in large measure, upon an unauthorized use of counterfeits and infringements of one or more of Plaintiffs' Marks. Specifically, Defendants are using counterfeits and infringements of one or more of Plaintiffs' famous names and Plaintiffs' Marks to make their e-commerce stores selling unauthorized goods appear more relevant and attractive to consumers searching for both Plaintiffs' and non-Plaintiffs' goods and information online. Many of Defendants' e-commerce stores are indexed on search engines and compete directly with Plaintiffs for space and consumer attention in the search results. By their actions, Defendants are contributing to the creation and maintenance of an unlawful marketplace operating in parallel to the legitimate marketplace for Plaintiffs' genuine goods. Defendants are causing individual, concurrent and indivisible harm to Plaintiffs and the consuming public by (i) depriving Plaintiffs and other third parties of their right to fairly compete for space online and within search engine results and reducing the visibility of Plaintiffs' genuine goods on the World Wide Web, (ii) causing an overall degradation of the value of the goodwill associated with Plaintiffs' Marks, (iii) increasing Plaintiffs' overall cost to market their respective goods and educate consumers about their brands via the Internet, and/or (iv) maintaining an illegal marketplace enterprise, which perpetuates the ability of Defendants and future entrants to that marketplace to confuse consumers and harm Plaintiffs with impunity.

75.     Defendants are concurrently conducting and targeting their counterfeiting and infringing activities towards consumers and likely causing unified harm within this district and

elsewhere throughout the United States.  As a result, Defendants are defrauding Plaintiffs and the consuming public for Defendants' own benefit.

76.     At all times relevant hereto, Defendants in this action had full knowledge of Plaintiffs' respective ownership of Plaintiffs' Marks, including their exclusive rights to use and license such intellectual property and the goodwill associated therewith.

77.     Defendants' use of Plaintiffs' Marks, including the promotion and advertisement, reproduction, distribution, sale and offering for sale of their Counterfeit Goods, is without Plaintiffs' consent or authorization.

78.     Defendants are engaging in the above-described unlawful counterfeiting and infringing activities knowingly and intentionally or with reckless disregard or willful blindness to Plaintiffs' rights for the purpose of trading on Plaintiffs' respective goodwill and reputations.  If Defendants' intentional counterfeiting and infringing activities are not preliminarily and permanently enjoined by this Court, Plaintiffs and the consuming public will continue to be harmed.

79.     Defendants' above identified infringing activities are likely to cause confusion, deception, and mistake in the minds of consumers before, during, and after the time of purchase. Moreover, Defendants' wrongful conduct is likely to create a false impression and deceive consumers, the public, and the trade into believing there is a connection or association between Plaintiffs' genuine goods and Defendants' Counterfeit Goods, which there is not.

80.     Moreover, at least Defendant Numbers 1 and 2 have registered their E-commerce Store Names using marks that are nearly identical and/or confusingly similar to at least one of Plaintiffs' Marks (the "Cybersquatted E-commerce Store Names").

81.     Defendant Numbers 1 and 2 do not have, nor have they ever had, the right or authority to use Plaintiffs' Marks. Further, Plaintiffs' Marks have never been assigned or licensed to be used on any of the websites, including the website operating under the Cybersquatted E-commerce Store Names.

82.     Defendant Numbers 1 and 2 have provided false and/or misleading contact information when applying for the registration of the Cybersquatted E-commerce Store Names or have intentionally failed to maintain accurate contact information with respect to the registration of the Cybersquatted E-commerce Store Names.

83.     Defendant Numbers 1 and 2 have never used the Cybersquatted E-commerce Store Names in connection with a bona fide offering of goods or services.

84.     Defendant Numbers 1 and 2 have not made any bona fide non-commercial or fair use of Plaintiffs' Marks on a website accessible under the Cybersquatted E-commerce Store Names.

85.     Defendant Numbers 1 and 2 have intentionally incorporated at least one of Plaintiffs' Marks in their Cybersquatted E-commerce Store Names to divert consumers looking for Plaintiffs' Internet websites to their own e-commerce store for commercial gain.

86.     Given the visibility of Defendants' various e-commerce stores and the similarity of their concurrent actions, it is clear Defendants are either affiliated, or at a minimum, cannot help but know of each other's existence and the unified harm likely to be caused to Plaintiffs and the overall consumer market in which they operate because of Defendants' concurrent actions.

87.     Although some Defendants may be physically acting independently, they may properly be deemed to be acting in concert because the combined force of their actions serves to multiply the harm caused to Plaintiffs.

88.     Defendants' payment and financial accounts, including but not limited to those specifically set forth on Schedule "A," are being used by Defendants to accept, receive, and deposit profits from Defendants' trademark counterfeiting and infringing, cybersquatting, and unfairly competitive activities connected to their E-commerce Store Names, and any other alias e-commerce store names being used and/or controlled by them.

89.     Further, Defendants, upon information and belief, are likely to transfer or secret their assets to avoid payment of any monetary judgment awarded to Plaintiffs.

90.     Plaintiffs have no adequate remedy at law.

91.     Plaintiffs are suffering irreparable injury because of Defendants' unauthorized and wrongful use of Plaintiffs' Marks. If Defendants' counterfeiting and infringing, cybersquatting, and unfairly competitive activities are not preliminarily and permanently enjoined by this Court, Plaintiffs and the consuming public will continue to be harmed while Defendants wrongfully earn a substantial profit.

92.     The harm sustained by Plaintiffs has been directly and proximately caused by Defendants' wrongful reproduction, use, advertisement, promotion, offers to sell, and sale of their Counterfeit Goods.

**COUNT I - TRADEMARK COUNTERFEITING AND INFRINGEMENT PURSUANT TO § 32 OF THE LANHAM ACT (15 U.S.C. § 1114)**

93.     Plaintiffs hereby adopt and re-allege the allegations set forth in Paragraphs 1 through 92 above.

94.     This is an action for trademark counterfeiting and infringement against Defendants based on their use of counterfeit and confusingly similar imitations of Plaintiffs' Marks in commerce in connection with the promotion, advertisement, distribution, offering for sale, and sale of the Counterfeit Goods.

95.     Specifically, Defendants are promoting and otherwise advertising, selling, offering for sale, and distributing goods bearing and/or using counterfeits and/or infringements of one or more of Plaintiffs' Marks. Defendants are continuously infringing and inducing others to infringe Plaintiffs' Marks by using one or more of Plaintiffs' Marks to advertise, promote, offer to sell, and/or sell counterfeit and infringing versions of Plaintiffs' branded goods.

96.     Defendants' concurrent counterfeiting and infringing activities are likely to cause and are causing confusion, mistake, and deception among members of the trade and the general consuming public as to the origin and quality of Defendants' Counterfeit Goods.

97.     Defendants' unlawful actions have caused and are continuing to cause unquantifiable and irreparable harm to Plaintiffs and are unjustly enriching Defendants with profits at Plaintiffs' expense.

98.     Defendants' above-described unlawful actions constitute counterfeiting and infringement of Plaintiffs' Marks in violation of Plaintiffs' rights under § 32 of the Lanham Act, 15 U.S.C. § 1114.

99.     Plaintiffs have each suffered and will continue to suffer irreparable injury while Defendants are earning a substantial profit due to Defendants' above-described activities if Defendants are not preliminarily and permanently enjoined.

## COUNT II - FALSE DESIGNATION OF ORIGIN
## PURSUANT TO § 43(a) OF THE LANHAM ACT (15 U.S.C. § 1125(a))

100.    Plaintiffs hereby adopt and re-allege the allegations set forth in Paragraphs 1 through 92 above.

101.    Defendants' Counterfeit Goods bearing, offered for sale, and sold using copies of one or more of Plaintiffs' Marks have been widely advertised and offered for sale throughout the United States via the Internet.

102.    Defendants' Counterfeit Goods bearing, offered for sale, and sold using copies of at least one or more of Plaintiffs' Marks are virtually identical in appearance to Plaintiffs' genuine goods. However, Defendants' Counterfeit Goods are different in quality. Accordingly, Defendants' activities are likely to cause confusion in the trade and among consumers as to at least the origin or sponsorship of their Counterfeit Goods.

103.    Defendants have used in connection with their advertisement, offer for sale, and sale of their Counterfeit Goods, false designations of origin and false descriptions and representations, including words or other symbols and designs, which falsely describe or represent such goods and have caused such goods to enter commerce in the United States with full knowledge of the falsity of such designations of origin and such descriptions and representations, all to Plaintiffs' detriment.

104.    Defendants have each authorized infringing uses of one or more of Plaintiffs' Marks in Defendants' advertisement and promotion of their counterfeit and infringing branded goods.  Some Defendants have also misrepresented to members of the consuming public that the Counterfeit Goods they advertise and sell are genuine, non-infringing goods.

105.    Additionally, Defendants are simultaneously using counterfeits and infringements of one or more of Plaintiffs' Marks to unfairly compete with Plaintiffs and others for space within organic and paid search engine and social media results. Defendants are thereby jointly (i) depriving Plaintiffs of valuable marketing and educational space online which would otherwise be available to Plaintiffs, and (ii) reducing the visibility of Plaintiffs' genuine goods on the World Wide Web and across social media platforms.

106.    Defendants' above-described actions are in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).

107.    Plaintiffs have no adequate remedy at law and have each sustained both individual and indivisible injury caused by Defendants' concurrent conduct. Absent an entry of an injunction by this Court, Plaintiffs will continue to suffer irreparable injury to their goodwill and respective business reputations, while Defendants are earning a substantial profit.

**COUNT III – CLAIM FOR RELIEF FOR CYBERSQUATTING**
**PURSUANT TO §43(d) OF THE LANHAM ACT (15 U.S.C. §1125(d))**
(Against Defendant Numbers 1 and 2 only)

108.    Plaintiffs hereby adopt and re-allege the allegations set forth in Paragraphs 1 through 92 above.

109.    At all times relevant hereto, Plaintiffs have been and still are the owners of the rights, title and interest in and to Plaintiffs' Marks.

110.    Defendant Numbers 1 and 2 have acted with the bad faith intent to profit from at least one of Plaintiffs' Marks and the goodwill associated with Plaintiffs' Marks by registering and using the Cybersquatted E-commerce Store Names.

111.    Plaintiffs' Marks were already distinctive and famous at the time Defendant Numbers 1 and 2 registered the Cybersquatted E-commerce Store Names.

112.    Defendant Numbers 1 and 2 have no intellectual property rights in or to Plaintiffs' Marks.

113.    The Cybersquatted E-commerce Store Names are identical to, confusingly similar to, or dilutive of at least one of Plaintiffs' Marks.

114.    Defendant Numbers 1 and 2's conduct is done with knowledge and constitutes a willful violation of Plaintiffs' rights in the Marks. At a minimum, the conduct of these Defendants constitutes reckless disregard for and willful blindness to Plaintiffs' rights.

115.    Defendant Numbers 1 and 2's actions constitute cybersquatting in violation of §43(d) of the Lanham Act, 15 U.S.C. §1125(d).

116.    Plaintiffs have no adequate remedy at law.

117.    Plaintiffs have suffered and will continue to suffer irreparable injury while Defendant Numbers 1 and 2 profit due to the above-described activities if those Defendants are not preliminarily and permanently enjoined.

## COUNT IV - COMMON LAW UNFAIR COMPETITION

118.    Plaintiffs hereby adopt and re-allege the allegations set forth in Paragraphs 1 through 92 above.

119.    This is an action against Defendants based on their promotion, advertisement, distribution, offering for sale, and/or sale of goods bearing and/or using marks that are virtually identical to one or more of Plaintiffs' Marks in violation of Florida's common law of unfair competition.

120.    Specifically, Defendants are promoting and otherwise advertising, selling, offering for sale, and distributing goods bearing and/or using counterfeits and infringements of one or more of Plaintiffs' Marks. Defendants are also each using counterfeits and infringements of one or more of Plaintiffs' Marks to unfairly compete with Plaintiffs and others for (i) space in search engine and social media results across an array of search terms and (ii) visibility on the World Wide Web.

121.    Defendants' infringing activities are likely to cause and are causing confusion, mistake, and deception among consumers as to the origin and quality of Defendants' e-commerce stores as a whole and all products sold therein by their use of Plaintiffs' Marks.

122.    Plaintiffs have no adequate remedy at law and are suffering irreparable injury because of Defendants' actions, while Defendants are earning a substantial profit.

## COUNT V - COMMON LAW TRADEMARK INFRINGEMENT

123.    Plaintiffs hereby adopt and re-allege the allegations set forth in Paragraphs 1 through 92 above.

124.    Plaintiffs are the respective owners of all common law rights in and to their respective Plaintiffs' Marks.

125.    This is an action for common law trademark infringement against Defendants based on their promotion, advertisement, offering for sale, and sale of their Counterfeit Goods bearing and/or using one or more of Plaintiffs' Marks.

126.    Specifically, each Defendant is promoting and otherwise advertising, distributing, offering for sale, and selling goods bearing and/or using infringements of one or more of Plaintiffs' Marks.

127.    Defendants' infringing activities are likely to cause and are causing confusion, mistake and deception among consumers as to the origin and quality of Defendants' Counterfeit Goods bearing and/or using Plaintiffs' Marks.

128.    Plaintiffs have no adequate remedy at law and are suffering irreparable injury because of Defendants' actions, while Defendants are earning a substantial profit.

## PRAYER FOR RELIEF

129.    WHEREFORE, Plaintiffs demand judgment on all Counts of this Complaint and an award of equitable relief and monetary relief against Defendants as follows:

a.    Entry of temporary, preliminary, and permanent injunctions pursuant to 15 U.S.C. § 1116, 28 U.S.C. § 1651(a), The All Writs Act, and Federal Rule of Civil Procedure 65 enjoining Defendants, their agents, representatives, servants, employees, and all those acting in concert or participation therewith, from manufacturing or causing to be manufactured, importing, advertising

or promoting, distributing, selling or offering to sell their Counterfeit Goods; from infringing, counterfeiting, or diluting Plaintiffs' Marks; from using Plaintiffs' Marks, or any mark or design similar thereto, in connection with the sale of any unauthorized goods; from using any logo, trade name or trademark or design that may be calculated to falsely advertise the services or goods of Defendants as being sponsored by, authorized by, endorsed by, or in any way associated with Plaintiffs; from falsely representing themselves as being connected with Plaintiffs, through sponsorship or association, or engaging in any act that is likely to falsely cause members of the trade and/or of the purchasing public to believe any goods or services of Defendants are in any way endorsed by, approved by, and/or associated with Plaintiffs; from using any reproduction, counterfeit, infringement, copy, or colorable imitation of Plaintiffs' Marks in connection with the publicity, promotion, sale, or advertising of any goods sold by Defendants; from affixing, applying, annexing or using in connection with the sale of any goods, a false description or representation, including words or other symbols tending to falsely describe or represent Defendants' goods as being those of Plaintiffs, or in any way endorsed by Plaintiffs and from offering such goods in commerce; from engaging in search engine optimization strategies using colorable imitations of Plaintiffs' names or trademarks and from otherwise unfairly competing with Plaintiffs.

     b.    Entry of a temporary restraining order, as well as preliminary and permanent injunctions pursuant to 28 U.S.C. § 1651(a), The All Writs Act, and the Court's inherent authority enjoining Defendants and all third parties with actual notice of an injunction issued by the Court from participating in, including providing financial services, technical services or other support to, Defendants in connection with the sale and distribution of non-genuine goods bearing and/or using counterfeits and/or infringements of Plaintiffs' Marks.

c.      Entry of an order pursuant to 28 U.S.C. § 1651(a), The All Writs Act, and the Court's inherent authority that upon Plaintiffs' request, those acting in concert or participation as service providers to Defendants, who have notice of the injunction, cease hosting, facilitating access to, or providing any supporting service to any and all e-commerce stores, including but not limited to the E-commerce Store Names, through which Defendants engage in the promotion, offering for sale and/or sale of goods bearing and/or using counterfeits and/or infringements of Plaintiffs' Marks.

d.      Entry of an order pursuant to 28 U.S.C. § 1651(a), The All Writs Act, and the Court's inherent authority that, upon Plaintiffs' request, any Internet marketplace website operators, administrators, registrars, and/or top level domain (TLD) Registries for the E-commerce Store Names who are provided with notice of an injunction issued by the Court, identify any e-mail address known to be associated with Defendants' E-commerce Store Names.

e.      Entry of an order pursuant to 15 U.S.C. § 1116, 28 U.S.C. §1651(a), The All Writs Act, and the Court's inherent authority that upon Plaintiffs' request, the Defendants and the top level domain (TLD) Registry for each of the E-commerce Store Names, and any other e-commerce stores used by Defendants or their administrators, including backend registry operators or administrators, place the E-commerce Store Names on Registry Hold status for the remainder of the registration period for any such e-commerce store, thus removing them from the TLD zone files which link the E-commerce Store Names and any other e-commerce store name being used and/or controlled by Defendants to engage in the business of marketing, offering to sell, and/or selling goods bearing and/or using counterfeits and infringements of Plaintiffs' Marks, to the IP addresses where the associated e-commerce stores are hosted.

f.      Entry of an order pursuant to 28 U.S.C. § 1651(a), The All Writs Act, and the Court's inherent authority canceling for the life of the current registration or, at Plaintiffs' election, transferring the E-commerce Store Names and any other e-commerce store names used by Defendants to engage in their counterfeiting of Plaintiffs' Marks to Plaintiffs' control so they may no longer be used for unlawful purposes.

g.      Entry of an order pursuant to 28 U.S.C. § 1651(a), The All Writs Act and the Court's inherent authority authorizing Plaintiffs to request any Internet search engines or service provider referring or linking users to any URL of the E-commerce Store Names, which are provided with notice of the order, to permanently disable, de-index or delist all URLs of the E-commerce Store Names and/or permanently disable the references or links to all URLs of the E-commerce Store Names used by Defendants to promote, offer for sale and/or sell goods bearing and/or using counterfeits and/or infringements of Plaintiffs' Marks, based upon Defendants' unlawful activities being conducted via the E-commerce Store Names as a whole and via any specific URLs identified by Plaintiffs.

h.      Entry of an order pursuant to 15 U.S.C. § 1116 and the Court's inherent authority, requiring Defendants, their agent(s) or assign(s) to assign all rights, title, and interest, to their E-commerce Store Names to Plaintiffs and, if within five (5) days of entry of such order Defendants fail to make such an assignment, the Court order the act to be done by another person appointed by the Court at Defendants' expense, such as the Clerk of Court, pursuant to Federal Rule of Civil Procedure 70(a).

i.      Entry of an order pursuant to 15 U.S.C. § 1116 and the Court's inherent authority, requiring Defendants, their agent(s) or assign(s) to instruct all search engines to permanently delist or deindex the E-commerce Store Names and, if within five (5) days of entry of such order

Defendants fail to make such a written instruction, the Court order the act to be done by another person appointed by the Court at Defendants' expense, such as the Clerk of Court, pursuant to Federal Rule of Civil Procedure 70(a).

      j.      Entry of an order pursuant to 28 U.S.C. § 1651(a), The All Writs Act, and the Court's inherent authority that, upon Plaintiffs' request, any Internet marketplace website operators and/or administrators who are provided with notice of an injunction issued by the Court, permanently remove any and all listings and associated images of goods bearing and/or using counterfeits and/or infringements of Plaintiffs' Marks via the e-commerce stores operating under the E-commerce Store Names, and upon Plaintiffs' request, any other listings and images of goods bearing and/or using counterfeits and/or infringements of Plaintiffs' Marks associated with or linked to the same sellers or linked to any other e-commerce store names being used and/or controlled by Defendants to promote, offer for sale and/or sell goods bearing and/or using counterfeits and/or infringements of Plaintiffs' Marks.

      k.      Entry of an order pursuant to 28 U.S.C. § 1651(a), The All Writs Act, and the Court's inherent authority that, upon Plaintiffs' request, Defendants and any Internet marketplace website operators and/or administrators who are provided with notice of an injunction issued by the Court, immediately cease fulfillment of and sequester all goods of each Defendant bearing and/or using one or more of Plaintiffs' Marks in its inventory, possession, custody, or control, and surrender those goods to Plaintiffs.

      l.      Entry of an order requiring, upon Plaintiffs' request, Defendants to request in writing permanent termination of any messaging services, usernames, e-commerce stores, and social media accounts they own, operate, or control on any messaging service, e-commerce marketplace, and social media website.

m.      Entry of an order pursuant to 28 U.S.C. § 1651(a), The All Writs Act, and the Court's inherent authority, authorizing Plaintiffs to serve an injunction issued by the Court on any e-mail service provider with a request that the service provider permanently suspend the e-mail addresses that are used by Defendants in connection with Defendants' promotion, offering for sale, and/or sale of goods bearing and/or using counterfeits and/or infringements of Plaintiffs' Marks.

n.      Entry of an order pursuant to 28 U.S.C. § 1651(a), The All Writs Act, and the Court's inherent authority authorizing Plaintiffs to serve the injunction on the e-commerce store's registrar(s) and/or the privacy protection service(s) for the E-commerce Store Names to disclose to Plaintiffs the true identities and contact information for the registrants of the E-commerce Store Names.

o.      Entry of an order requiring Defendants to account to and pay Plaintiffs for all profits earned from Defendants' trademark counterfeiting and infringing and unfairly competitive activities and that the profit award to Plaintiffs be trebled, as provided for under 15 U.S.C. §1117, or that Plaintiffs be awarded statutory damages from each Defendant in the amount of two million dollars ($2,000,000.00) per each counterfeit trademark used and product type offered for sale or sold, as provided by 15 U.S.C. §1117(c)(2) of the Lanham Act.

p.      Entry of an order requiring Defendant Numbers 1 and 2 to account to and pay Plaintiffs for all profits resulting from Defendant Number 1 and 2's cybersquatting activities and that the profit award to Plaintiffs be trebled, as provided for under 15 U.S.C. § 1117, or that Plaintiffs be awarded statutory damages from Defendant Numbers 1 and 2 in the amount of one hundred thousand dollars ($100,000.00) per cybersquatted domain name used as provided by 15 U.S.C. § 1117(d) of the Lanham Act.

q.      Entry of an award pursuant to 15 U.S.C. § 1117 (a) and (b) of Plaintiffs' costs and reasonable attorneys' fees and investigative fees associated with bringing this action.

r.      Entry of an order pursuant to 15 U.S.C. § 1116, 28 U.S.C. § 1651(a), The All Writs Act, Federal Rule of Civil Procedure 65, and the Court's inherent authority that, upon Plaintiffs' request, Defendants and any financial institutions, payment processors, banks, escrow services, money transmitters, e-commerce shipping partner, fulfillment center, warehouse, or marketplace platforms, and their related companies and affiliates, identify and restrain all funds, up to and including the total amount of judgment, in all financial accounts and/or sub-accounts used in connection with the E-commerce Store Names, or other alias identification names used by Defendants presently or in the future, as well as any other related accounts of the same customer(s) and any other accounts which transfer funds into the same financial institution account(s), and remain restrained until such funds are surrendered to Plaintiffs in partial satisfaction of the monetary judgment entered herein.

s.      Entry of an order requiring Defendants, at Plaintiffs' request, to pay the cost necessary to correct any erroneous impression the consuming public may have received or derived concerning the nature, characteristics, or qualities of Defendants' products, including without limitation, the placement of corrective advertising and providing written notice to the public.

t.      Entry of an award of pre-judgment interest on the judgment amount.

u.      Entry of an order for any further relief as the Court may deem just and proper.

DATED: October 30, 2023.          Respectfully submitted,

STEPHEN M. GAFFIGAN, P.A.

By:   **Stephen M. Gaffigan**
Stephen M. Gaffigan (Fla. Bar No. 025844)
Virgilio Gigante (Fla. Bar No. 082635)
T. Raquel Wiborg-Rodriguez (Fla. Bar. No. 103372)
Christine Ann Daley (Fla. Bar No. 98482)

401 East Las Olas Blvd., Suite 130-453
Ft. Lauderdale, Florida 33301
Telephone: (954) 767-4819
E-mail: Stephen@smgpa.cloud
E-mail: Leo@smgpa.cloud
E-mail: Raquel@smgpa.cloud
E-mail: Christine@smgpa.cloud

Attorneys for Plaintiffs

## SCHEDULE "A"

**[This page is the subject of Plaintiffs' Motion to File Under Seal.  As such, this page has been redacted in accordance with L.R. 5.4(b)(1)]**